Dear Ms. Edwards:
On behalf of the Livingston Parish Council, you have requested an opinion of this Office regarding Livingston Parish's rights concerning a parcel of land owned by the Parish and leased to a company, Waste Management, for use as a sanitary landfill. Specifically, you ask the following questions:
 1) Does the Parish of Livingston have the legal right to alter, terminate, or cancel the lease with Waste Management regarding the storage of solid waste on the leased tract?
 2) Can the Parish recover any additional monies for the usage of the solid waste permit originally issued to the Parish of Livingston and now utilized by Waste Management?
 3) Does the Attorney General have any suggestions regarding methodology that the Parish could employ to gain any economic benefits from the leased tract?
 Background
In 1987, Livingston Parish (also referred to herein as "Parish of Livingston or "the Parish") acquired a 100 acre tract of land from Cavenham Forest Industries, Inc. (hereafter, "Cavenham"). Prior to the Parish's acquisition of the tract, Cavenham had granted, in 1986, a ninety-nine (99) year lease on the tract in favor of American Waste and Pollution Control (hereafter "AWPC") for the use of the tract as a solid waste landfill. After its acquisition of the property in late 1987, the Parish acquired a ten-year permit from the Louisiana Department of Environmental Quality (hereafter "DEQ") to operate a sanitary solid waste landfill on the tract. Subsequently, AWPC operated the landfill under the Parish's permit for the duration of the permit. At some point, AWPC was purchased by Waste Management, who promptly began to exercise AWPC's rights under its lease of the subject property. In 1997, the Parish negotiated a new agreement with *Page 2 
Waste Management for the collection and disposal of solid waste. It is our understanding that Waste Management now holds the current permit for the operation of a sanitary landfill on the site.
Can the Parish Alter, Terminate, or Cancel the Lease?
As an initial matter, it should be noted that the Parish of Livingston is bound to honor the burden of the Waste Management lease on the subject property. The reason for this is that, as long as a lease is properly recorded at the time of a sale, the purchaser is deemed to have constructive knowledge of the lease and thus tacitly accepts the burden as a condition of the sale. La. C.C. Art. 2711. See generally, Knowles v. WholesaleElectronic Supply of Shreveport, Inc., 388 So.2d 426 (La.App. 2 Cir. 1980). If the lease was properly recorded, it is clear that the Parish must honor the lease. The deed that you provided with your request letter clearly identifies the existence of the lease. However, the law is clear that it is recordation of the lease that is necessary to affect subsequent owners of the underlying property. La. C.C. Art. 2711 and 2712. Thus, if the lease was noted in the deed, but not properly recorded, the Parish is not bound to honor the lease. However, we have no reason to believe that there is a lack of proper recordation in this case and indeed your letter suggests that it was so recorded. Absent such a showing, it is our opinion that there is no way for the Parish to terminate or cancel the lease based on a lack of knowledge of the lease at the time of the sale.
Additionally, the Parish is bound to the terms of the lease that it acquired through its purchase of the subject property in 1987. See, Prados v. South Central Bell Telephone Company,329 So.2d 744, 749 (La. 1975), on rehearing. Thus, pursuant to the lease, which, through the sale, the Parish was subrogated to the position of Cavenham, the Parish is entitled to a peaceful return of the tract upon termination of the lease. See, Act of Lease Between Cavenham and AWPC, ¶ 6. The lease term is for ninety-nine years, the maximum permissible limit of a fixed term lease under the Civil Code. La. C.C. Art. 2679. Thus, barring a failure of Waste Management to perform its obligations under the terms of the lease, the Parish will be returned to its peaceful possession sometime around the year 2085. There is nothing in the record submitted to this Office that provides for any alteration of the lease terms until it expires (at which time alteration would be moot). We are, therefore, of the opinion that the Parish cannot unilaterally alter the terms of the original lease between AWPC and Cavenham.
It should also be noted that the Parish owes the lessee peaceful possession. La. C.C. Art. 2700. Thus, absent a defect in the lease, recordation, or a violation of the terms of the lease by the lessee, the Parish cannot harass the lessee on the sole grounds that it finds the permitted use of the property objectionable. A termination of the lease can only occur for a failure to perform the requisite obligations under the lease. La. C.C. Art. 2719. We are not privy to any *Page 3 
information that suggests a derogation of the lease obligations in this situation, so we express no opinion as to the lessee's adherence to the terms of the lease. In any event, the adherence to those terms requires a factual inquiry, for which a court of proper jurisdiction is the appropriate venue to vet such claims.
We also take notice of the fact that the Parish may want to terminate the lease with Waste Management merely because of the storage of solid waste on the subject property. We caution, however, that, at least for the duration of the lease, Waste Management has a vested right in the maintenance of that property as a solid waste disposal site. If the lease cancellation divests Waste Management of their right to use the property according to the terms of their lease, the Parish may be subject to a suit for a taking (of a vested right) under the Louisiana Constitution, Art. 1, Sec. 4 or the Fifth Amendment to the United States Constitution.
We are cognizant that solid waste disposal is not an attractive land use and that some nearby landowners may be unhappy with the current use of the property. However, as has been noted by scholars, "it is undeniable that Americans as a whole are producing more municipal solid waste than they did fifty or a hundred years ago . . ." William Rathje and Cullen Murphy, RUBBISH! THE ARCHAEOLOGY OF GARBAGE: WHAT OUR GARBAGE TELLS US ABOUT OURSELVES 51 (Harper Collins Publishers 1992). Thus, though the neighbors of this landfill would, more than likely, be happy to see it relocated, the reality is that it has to go somewhere and merely pushing it off onto the adjoining property owned by Waste Management would only forestall the inevitable problem that the entire area is in need of landfill space that is ever-shrinking. Unfortunately for all of us, as Rathje and Cullen note, "[g]arbage is among humanity's most prodigious physical legacies to those who have yet to be born." Id. at 4. Thus, legal considerations aside, the solid waste must go somewhere and because Waste Management holds a valid lease on the property, for the time-being, logic dictates that the waste should stay where it is rather than be moved into another landfill, thereby reducing the latter's capacity to offset this unfortunate legacy's impacts on all Americans.
Can the Parish Recover for the Use of its Solid Waste Permit?
As to your second question which asks if there are any additional monies for the usage of the solid waste permit originally issued to the Parish of Livingston and under which AWPC/Waste Management operated from 1987 through 1997 that the Parish can now claim, we opine that the answer to this question is in the negative. Unless the Parish bargained for some consideration with AWPC (Waste Management's ancestor) in order for the Parish to secure the DEQ permit to operate solid waste facility on the subject property in 1987, we opine that there is nothing that the Parish can now demand of Waste Management. There is one possible exception to this generalization. The Parish may make a request for permit fees that it may have paid on AWPC/Waste Management's behalf. We *Page 4 
have no indication as to whether the Parish did or did not pay any such fees during the period of 1987 through 1997, so we make no assumption that such fees are actually due. Even if the Parish did pay some such fees, it is not clear what the prescriptive period on asserting a claim for the fees would be. It seems that the payment of these fees would represent a continuous action under a general implied obligation to facilitate the use of the lease, thus allowing recovery (under a contract theory) for up to ten years from the final payment. La. C.C. Art. 3499. This could extend the prescriptive period until sometime in 2007. However, absent further information on this issue, we merely identify it as a possibility for the Parish to consider. We do note, though, that the cost of recovering any such fees, if they were paid by the Parish, may outweigh the actual return on the effort, should the Parish even be successful, thus likely making such an effort largely futile.
We also note that there is no intrinsic value to the permit that we are aware of. Presumably, AWPC could have obtained the permit on their own and thus, though it is required to conduct the sort of business that AWPC/Waste Management is in, the Parish did not provide any service of value to the private company by securing the permit to which it is now entitled recompense.
Does this Office Have Any Suggestions as to How to GainEconomic Benefits from the Leased Tract?
This Office can suggest no legal means to obtaining a financial benefit from a lease that the Parish is duty-bound to honor. The Parish may try to negotiate a new lease with provisions favorable to itself, but this is a political and business decision on which this Office takes no position. It is doubtful, though, that Waste Management would be willing to renegotiate a lease agreement that it is already legally entitled to specific performance under (the Parish's providing it with peaceable use) and for which it does not owe any substantial benefit to the Parish.
We hope this sufficiently answers your inquiry, however if we may be of further assistance please do not hesitate to contact our office.
 Sincerely yours,
 CHARLES C. FOTI, JR.
 ATTORNEY GENERAL
 By:____________________
 RYAN M. SEIDEMANN
 Assistant Attorney General